## THE DELI.

## THE ROBERT PALMER.

### (District Court, E. D. New York. March 22, 1918.)

1. SHIPPING ⊚⇒216—SUNKEN VESSEL—EVIDENCE—SUFFICIENCY.
   On libel for injuries to a sunken vessel, whose position was marked, evidence *held* to show that the steamer libeled in some way collided with the sunken vessel.

2. SHIPPING ⊚⇒216—SUNKEN VESSEL—LIABILITY—EVIDENCE—SUFFICIENCY.
   Evidence *held* to warrant a finding that a steamer was in fault in colliding with a sunken vessel, whose position was indicated by a spar and was known to the navigating officers of the steamer, though the spar used as a warning buoy had been fixed by the libelant without notification to proper authorities.

3. SHIPPING ⊚⇒216—SUNKEN VESSEL—DAMAGES—MEASURE.
   Where a steamer was at fault in colliding with a sunken vessel, the steamer is liable only for the damage resulting from the collision, and that does not include the expense of raising and drydocking the vessel.

In Admiralty. Libel by Henry H. Lee against the steamer Deli, claimed by Richard J. Barrett, in which the tug Robert Palmer was impleaded. Decree for libelant against the steamer Deli.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Foley & Martin, of New York City, for libelant.

Burlingham, Montgomery & Beecher, of New York City, for the Deli.

Harrington, Bigham & Englar, of New York City, for the Robert Palmer.

CHATFIELD, District Judge. The libelant claims for damages alleged to have been inflicted upon the steamer McDonough, on the morning of April 19, 1916, by the steamer Deli, which was at the time moving up the Bay Ridge Channel, just before high water, slack, and which was waiting for certain tugs previously engaged to dock the Deli along the southerly side of Pier 6 of the Bush Stores. The McDonough had sunk the previous forenoon, and evidently suffered considerable damage at the time of sinking, as her rail and the roof of her pilot house floated to the surface and were held by the stays of the smokestack, so that they were visibly floating upon the surface at the time the Deli approached.

The general facts as shown at the trial were then stated orally as follows:

"There is nothing to dispute the testimony that the McDonough was proceeding from the Hudson river into the Bay Ridge Channel on a course which is plainly indicated on the chart, so as to pass the mouth of the Gowanus Canal 500 or 600 feet from the shore. She then headed, with the wind at her stern, for Pier 2 of the Bush Dock. There is no question that the wind was so strong that ships could not be moved in that neighborhood during the afternoon and that the wind continued until midnight.

"The McDonough was swamped so quickly that her crew had no time to do anything except swim, and sank with her engines still running under a jingle bell, and with her helm to starboard in an attempt to head for the slip between Bush Dock 5 and Bush Dock 6. She sank stern first, and was located. when found, on the bottom between 250 and 300 feet out from the southerly line of Pier 6.

"The steamer Deli, coming up from Staten Island the following morning (that is, the 19th of April, 1916), according to her captain's testimony, reached the neighborhood at a little after 8 o'clock. The Sandy Hook pilot was on the bridge, and he had been informed, before leaving Staten Island, of the sunken wreck lying off the end of Pier 6. He proceeded up the Bay Ridge Channel until he reached a point above the sunken wreck. The Deli was then met by tugs which took her back, the tide still running flood, so that she was put into the dock around the upper corner of Pier 5, without coming in contact with Pier 6 until she was alongside.

"According to the testimony of the witnesses from the Deli and the witnesses from the tug, the Deli was carried by the tugs around the spot where this wreck lay, of which all the witnesses were aware. Floating wreckage had been seen, and also a spar, which is called a 'stick,' and which is described as having been merely 'wet' in color. This stick was of yellow wood, or yellow pine, and was at a point to the north of the course of the Deli when passing into the slip. These witnesses place this stick alongside of a derrick (that is, to the southerly side of the derrick), which they place at various distances outside of the pier; one of them saying that it was lying next to the pier with a line to the pier, while the captain of the Deli puts the spar some 300 feet outside of the pier at the time. This spar was evidently the buoy fixed by the owner of the McDonough.

"There is no dispute that this spar was weighted with chains at the lower end, fastened with rope to an anchor, and, on the afternoon of the 18th, after locating the wreck, was placed a few feet from the side of the tug as she was lying upon the bottom.

"The testimony is that this spar then projected a few feet above water, and had sufficient weights, so that it stood at an angle of about 60 degrees, with sufficient length of mooring to offset the rise of the tide.

"There is no question that the flood tide was running until just before the Deli passed into her slip, and it had been flood tide when the tug sank on the previous day.

"On this testimony, it is impossible to hold the tugs which had the Deli in charge, and which have been brought in on petition. The libelant had the opportunity to elect whether he would charge fault on the part of the Deli or on the part of the tugs, and, according to the libelant's testimony, as well as that of all the other witnesses, the Deli never passed over the location of the wreck after the tugs came alongside.

"The petition, therefore, to bring in the tugs, must be dismissed, and, in so far as the witnesses from the tugs offer evidence as to the issue between the libelant and the Deli, they would be witnesses for the Deli, and not for the tugs, so that, although called on behalf of the tugs, their testimony on these matters would be direct examination on behalf of the claimant, and not cross-examination in that respect."

[1] Thereafter the issues were argued from the basis of the facts indicated, the testimony has been written out, and a few further findings or conclusions must be stated.

The tugboat lay just above the line of the lower side of Pier 6. She was listed a little to port, and the smokestack was brought up by the derrick from her port side before the diver attempted to sweep a chain under the vessel herself. With the smokestack, the wreckers brought to the surface a part (some 12 or 15 feet) of the spar which had been used as a buoy, and which, according to the captain of the wrecking crew, had been in plain sight when he was waiting for the derrick boat before the passage of the Deli, which came up the river at about 8:15 a. m.

This captain testifies that he was then seated on the end of Pier 6, and saw the stern of the Deli swing around, so as to pass directly over this spar. He states that the spar disappeared. When it was raised, some half hour later, it had been cut in two, and some 10 feet had floated away. When the tug was raised it was seen that the main house and the pilot house had been shifted over to port enough to break some of the beams. The libelant alleges that all of the damage was inflicted by the Deli in passing immediately over the wreck. There was at least 42 feet of water at the spot at the time, and the Deli was drawing some 23 feet of water at the stern. The McDonough, when lying upon the bottom, had a total height to the top of her pilot house of 26 feet, and her smokestack extended up to within 5 or 6 feet of the surface of the water. The McDonough was running at full speed when she sank, and the survey shows no evidence of explosion or other accident, which would account for any injuries to the boat beyond those occasioned by the sinking or by collision thereafter.

The libelant produced two other witnesses, who were on Pier 6 the morning after the tug sank, and who saw the Deli pass up the river under her own power, but sometimes drifting with the tide, and with her stern angling in toward the shore. The Deli had come from Staten Island, and the Sandy Hook pilot was still on board. Evidently the tugs, which were to place her in the berth between Piers 5 and 6, had not yet reached the vessel, which was headed in toward the slip

as it approached. Then, in order to wait for the tugs, the Deli worked out into the river, but continued to back and fill, all the while being carried northward by the tide, until the tugs arriving took the boat in tow, turned her around, brought her back, and then worked her around the northerly corner of Pier 5, into the slip.

One of the witnesses testifies that he was in his office on the end of Pier 6, and saw the Deli go over the spar. After the Deli passed the spar had disappeared. Another witness testifies that he could not see the spar from where he was, but that he saw the Deli just as she passed over the spot where the wreck had been lying, and that from that time for a short distance the Deli was in his plain sight. Opposed to this is the testimony of the Sandy Hook pilot, and of the captain and officers of the Deli, who all saw the timber which they call a "stick," which was standing some 6 feet out of water, at an angle of some 60 degrees, but which they placed at various distances from the pier. These witnesses all state that the Deli was never near this particular stick, that she passed up some 600 feet outside of the pier, and some of them testify that the stick was still in sight when the Deli came back under charge of the tugs. The Sandy Hook pilot had been informed of the existence of the wreck, before leaving Staten Island. None of the foreign officers on the vessel recognized the buoy as a warning, but they apparently all saw the wreckage floating on the surface of the water or saw the spar which was used as a buoy.

The Sandy Hook pilot testifies that the Deli had been keeping to the westward of mid-channel, up to the point where she met the tugs. But he then immediately places the Deli at a point one length outside of the wreck, as the nearest to which he approached the stick or buoy marking the spot. If he were intending to go into the slip between Piers 5 and 6, it is inconceivable that he violated the channel rule and kept on the wrong side of the channel, all the way up the river, particularly as he was expecting to meet the tugs and to turn into the slip before he reached Pier 5. If he were but one length away from the wreck, then the stern of the Deli would be within striking distance of the wreck, if she swung broadside, as the witnesses testify that she did, when backing to delay her passage upstream. If, as seems practically certain, she had gone in closer to shore before learning that the tugs would not be ready and that the flood tide had not sufficiently stopped running, it is apparent that the Deli would be compelled to work further out in the stream, in order to avoid the wreck as she passed up the river. The entire weight of the evidence is too strong to escape the conclusion that the Deli, in some way, came in contact with the McDonough.

[2, 3] But the case cannot be closed with this finding. Ordinarily the extent of the damage can be safely left for the master upon the reference to compute the amount of damage. But to give the libelant a decree and then to pass on to the master a determination of the very issues which have been disposed of in the main case, would avail little. In fact, the parties themselves have gone further in their proof. It has been shown on the part of the libelant that the severe storm which sank the McDonough continued, so that no boats were shifted during

249 F.—62

the balance of that day, nor through the night. On the morning upon which the Deli appeared, the various tugs operating in the neighborhood were shown by the testimony to have known about the presence of the McDonough and to have seen and observed the spar with its white lantern, which had been used as a warning buoy. The tugs which docked the Deli had earlier taken out a barge or a steamer from the slip above Pier 6. But they evidently were careful to avoid the wreck of the McDonough. There is nothing to indicate that the smokestack of the McDonough was touched by any of the small vessels moving around the neighborhood, and the testimony of the wreckers, showing that the spar and its cable were tangled up with the smokestack, shows with sufficient certainty that the smokestack was carried away when the spar was run down by the Deli.

It must be noted that the weight of the chain used to make the spar serve as a buoy, by holding its lower end submerged, was sufficient, when increased by the stack, to hold the remaining portion of the spar entirely under water. Thus we have an explanation of how the spar disappeared from sight, and it may be that the portion broken off by the screw of the Deli was later nearer the dock, and gave rise to the testimony of the witnesses as to the yellow pine stick which they saw close into the shore. But the libelant did not notify the proper authorities. He assumed to fix the warning buoy himself. The red buoy was nothing more than an old and dirty spar, which, when wet, might still be seen to be red in color, but which, nevertheless, was not a red buoy, such as is ordinarily used for the purpose.

If the pilots of the Deli and of the tugs operating around the spot had not known of the existence and location of the wreck, the libelant would have had a much greater burden in justifying his course and in sustaining the burden of proof. But on the case as it stands that burden has been sufficiently met, and a decree must be entered holding the Deli responsible for such damage as is shown to have been the result of the collision alone. This cannot include the expense of raising and drydocking the boat. Nor can it include such repairs as would have been necessary from the sinking if no collision had occurred. A reference will be ordered to fix the amount of damage from broken timbers and from correcting the displacement of the deckhouse and the pilot house and for resetting the smokestack.

Decree will be entered accordingly.